USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/15/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- X

DEREK FARRELL,

                             Plaintiff,

            -v-

CITY OF NEW YORK, et al.,

                        Defendants.

--------------------------------------------------------------------- X

15 Civ. 8401 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiff Derek Farrell, a hospital security guard, brings this action against New York

City and New York City Police Department ("NYPD") Officers Ronald Bolte and Wilbert

Morales, alleging false arrest under 42 U.S.C. § 1983. Farrell's claims arise out of an altercation

in a hallway in Bronx Lebanon Hospital (the "Hospital"). Farrell claims that, as he sought to

stand guard outside an operating room where an officer was undergoing surgery, Morales

instigated a physical confrontation with him, and Bolte then forced him into a separate room,

where, for approximately 20 minutes, Farrell was detained against his will.

Pending now are cross-motions for summary judgment. For the following reasons, the

Court holds that, on Farrell's false arrest claim against Morales, summary judgment is required

in Morales's favor. As to Farrell's false arrest claim against Bolte, however, material facts

remain in dispute. The Court accordingly denies the motions by both parties as to that claim.

I.      **Background**

      A.      **Factual Background**[1]

---

[1] The Court draws its account of the underlying facts from: the parties' respective submissions
on the motion for summary judgment, including each party's Statement Pursuant to Local Civil

1

On October 24, 2012, Farrell was working as a security guard in the emergency room at the Hospital. JSF ¶ 7. That evening, an individual later identified as a police officer was admitted to the emergency room after suffering a gunshot wound to the chest. *Id.* ¶ 9. At approximately 6:43 p.m., the injured officer was placed in Code Room 1 (the "Code Room"). *Id.* ¶ 10. Farrell testified that he was directed by hospital staff to stand in front of the Code Room to prevent anyone from entering. Faddis Decl. Ex. B ("Farrell Dep.") at 37.

---

Rule 56.1, *see* Dkt. 45 ("Def. 56.1") and Dkt. 68 ("Pl. 56.1), as well as each party's counter-statement, *see* Dkt. 61 ("Def. Counter 56.1") and Dkt. 70 ("Pl. Counter 56.1"); the Declaration of Hannah V. Faddis in support of defendants' motion, Dkt. 43 ("Faddis Decl."), and attached exhibits; the declaration of Katherine E. Smith in support of plaintiff's motion, Dkt. 66 ("Smith Decl."), and attached exhibits; and the parties' joint statement of undisputed facts, Dkt. 37-1 ("JSF").

A particularly salient exhibit is the video file attached as Exhibit F to the Faddis Declaration ("Video"), which is a copy of surveillance footage from Bronx Lebanon Hospital capturing critical aspects of Farrell's encounter with the police on October 24, 2012. The Video is silent. The Video's timestamp corresponds to the time of day at which the Video was recorded. Insofar as the Video depicts certain events from October 24, 2012, the Video is reliable objective evidence on which the Court may rely on summary judgment. "Although on summary judgment the evidence must be viewed in the light most favorable to . . . the non-moving parties, when there is reliable objective evidence—such as a recording—the evidence may speak for itself." *Marcavage v. City of New York*, 689 F.3d 98, 110 (2d Cir. 2012) (rejecting plaintiffs' "characteriz[ation of] their behavior toward the [arresting] officers as cordial" because "audio recording show[ed] indisputably that they were neither courteous nor complaint") (citing *Scott v. Harris*, 550 U.S. 372, 378–81 (2007) (rejecting non-movant's account of police chase because it was "so utterly discredited by the [video recording] that no reasonable jury could have believed him")).

Citations to a party's 56.1 statement incorporate the evidentiary materials cited therein. When facts stated in a party's 56.1 statement are supported by testimonial, video, or documentary evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Officers Bolte and Morales, both NYPD lieutenants, received a radio call advising that an injured individual, possibly from NYPD, had been taken to the Hospital. JSF ¶¶ 2, 5, 11. Bolte reported to the emergency room first, at approximately 6:49 p.m. *Id.* ¶ 13. Bolte saw that medical personnel were attending to an injured officer, and began making notations on his phone. *Id.* ¶¶ 14–15. Bolte also established phone contact with the NYPD operation center to report on the injured officer's condition. Pl. Counter 56.1 ¶ 3.

At approximately 6:50 p.m., Morales arrived, at which point, at Bolte's request, Def. Counter 56.1 ¶ 15, Morales attempted to enter Code Room 1, JSF ¶ 19. By this time, Farrell was positioned outside of that Code Room, JSF ¶ 18, in a hallway occupied by at least 10 police officers, *see* Video at 6:50:49, who, apparently, had come out of solidarity for the injured officer.

The parties dispute what precisely happened next, although the silent video capturing much of the events in the hallway conclusively establishes certain events. It is clear that as Morales attempted to enter the Code Room, he and Farrell made physical contact. JSF ¶ 19. In Farrell's telling, Morales placed the back of his left hand against Farrell's waist and "tried to push" Farrell aside so that Morales could enter the Code Room. Farrell Dep. at 57. In Morales's telling, however, Farrell initiated the contact when he "grabbed" Morales by the forearms to prevent Morales from entering the Code Room. Faddis Decl. Ex. D ("Morales Dep.") at 65–66. The Video does not reveal who made contact with whom first. At most, the Video confirms that Morales and Farrell made contact, resulting in Farrell shifting backward into Code Room 1, and that Farrell thereafter moved forward toward Morales. *See* Video at 6:51:30–40.

The parties dispute how much of this confrontation Bolte saw. *Compare* Def. 56.1 ¶ 5 ("Lt. Bolte was on the phone when the physical interaction between Farrell and Morales happened."), *with* Pl. 56.1 ¶ 25 ("Bolte could see the interaction between Morales and Farrell.").

Bolte testified at his deposition that he was unable to see Morales attempt to get past Farrell, and instead only noticed Morales falling backward with Farrell's hands on his chest. Faddis Decl. Ex. C ("Bolte Dep.") at 87–88, 93. However, earlier, in testimony given during an investigation conducted by the Civilian Complaint Review Board, Bolte testified that he had witnessed the start of their encounter, as Morales attempted to "pull the curtain." Smith Decl. Ex. B ("Bolte CCRB") at 7. And during an investigation conducted by what plaintiff's counsel describes as "Bronx Investigations," *see* Smith Decl. ¶ 4, Bolte testified that he could "see out of the corner of [his] eye what's happening and Lt. Morales trying to get around this guy." Smith Decl. Ex. C ("Bolte Bx. Invest.") at 8. As to this factual dispute, concerning what portion of the confrontation Bolte actually witnessed, the video is likewise inconclusive. Farrell and Morales were situated immediately in front of Bolte, such that Bolte undoubtedly could have seen their entire encounter, but with Bolte's back facing the camera, the Court cannot draw a certain conclusion. *See* Video at 6:51:30–40.[2]

However the physical confrontation began, and whatever Bolte saw of it, it is undisputed that at approximately 6:51:41, Farrell moved backwards into Bolte, pushing Bolte against the wall outside the code room. JSF ¶ 20. The parties dispute how Farrell came to move backwards into Bolte, *id.*, but it is undisputed that Bolte then put his hands on Farrell's torso (and arm, *see* Video at 6:51:46), led Farrell across the hallway, and, at approximately 6:51 p.m., pushed Farrell into another room (the "x-ray room"), JSF ¶ 21; Video 6:51:42–52. From this point forward, Farrell had no further contact with Morales. JSF ¶ 33.

---

[2] It is undisputed that following Farrell and Morales's initial contact, Morales stated either "don't put your hands on me," "don't hit me," or "don't touch me," but the parties dispute whether Bolte took action as a result of hearing this statement. *See* Pl. Counter 56.1 ¶ 6.

Bolte did not follow Farrell into the x-ray room. *Id.* ¶ 24. Nor did he or any other NYPD officer place Farrell in handcuffs. *Id.* ¶ 25. The parties dispute whether Bolte said anything to Farrell upon pushing him into the x-ray room. *Compare* Bolte Dep. at 114 (Bolte testifying he "said nothing" to Farrell), *with* Farrell Dep. at 59 (Farrell testifying Bolte said "[g]et in there" and "ordered" him to remain inside). It is undisputed that Bolte ordered at least one officer to keep Farrell in the x-ray room. Def. Counter 56.1 ¶ 33 (citing Bolte Dep. at 120–21); *see also* Bolte CCRB at 8 (Bolte testifying he ordered "three officers assigned to [Farrell], because he needs three because he's humongous, and don't let him out for right now").

The Video, which captures the door to the x-ray room and the hallway outside it, but not the inside of the x-ray room, confirms that several officers remained positioned outside of the x-ray room for approximately three minutes while Farrell remained inside. *See* Video at 6:52:00–55:00. Thereafter, Bolte apparently directed one officer to remain. *See id.* at 6:55:03–08. That officer moved away roughly one minute later, at approximately 6:56 p.m. *See id.* at 6:55:51. By 6:59 p.m., the majority of the officers had left the hallway entirely, with officers returning only sporadically until another large group of officers appeared immediately outside the x-ray room at approximately 7:06 p.m. *See id.* at 6:59:00–7:10:00. At no time did Farrell attempt to leave the x-ray room. JSF ¶ 31. Medical personnel, however, came and went from the x-ray room freely, *see* Video at 7:03:25–35, 7:05:12–35, 7:06:00–05, and it is undisputed that the door was not locked, Pl. Counter 56.1 ¶ 14.

At approximately 7:11 p.m., Bolte and several members of the hospital security staff entered the x-ray room. JSF ¶ 27. At approximately 7:12:18 p.m., after speaking with Farrell and other staff, Bolte exited the x-ray room. *Id.* ¶ 29. At approximately 7:13:49 p.m., Farrell

exited the room, *id.* ¶ 30, after he was told by a fellow hospital employee that the police had left the area, Pl. Counter 56.1 ¶ 19.

Farrell did not suffer any physical injuries as a result of this incident. JSF ¶ 34. He remains employed at the Hospital. *Id.* ¶ 35.

### B. Procedural History

On October 23, 2015, Farrell filed the complaint in this action, alleging municipal liability, false arrest, unreasonable force, malicious abuse of process, and failure to intervene. *See* Dkt. 1 ("Compl."). On February 8, 2016, defendant New York City (the "City") answered the complaint. Dkt. 5. On April 19, 2016, the case was reassigned to this Court. *See* Dkt. 9. On June 13, 2016, Bolte and Morales filed a joint answer. Dkt. 12.

On February 6, 2017, at a pre-motion conference, Farrell agreed to withdraw his *Monell* and malicious abuse of process claims. *See* Dkt. 46 at 21. The Court directed Farrell to file notice on ECF withdrawing these claims and set a briefing schedule. *See* Dkt. 30.

On March 20, 2017, the parties filed a joint statement of undisputed facts. Dkt. 37. On April 3, 2017, defendants filed a motion for summary judgment, Dkt. 42, the Faddis Declaration, Dkt. 43, an accompanying memorandum of law, Dkt. 44 ("Def. Mem."), and defendants' Rule 56.1 statement, Dkt. 45. On May 11, 2017, Farrell submitted a memorandum of law in support of his motion for summary judgment ("Pl. Mem."), a Rule 56.1 statement, and the Smith Declaration. *See* Dkts. 66–68. On June 1, 2017, defendants submitted their opposition and reply brief ("Def. Opp."), as well as their counter-statement to Farrell's Rule 56.1 statement. *See* Dkts. 56, 59–61. On June 22, 2017, Farrell submitted a memorandum in opposition to defendants'

motion for summary judgment ("Pl. Opp."), as well as a counter-statement of facts. *See* Dkts. 69–70. Farrell's opposition brief withdrew his claim for excessive force. Pl. Opp. at 1 n.1.[3]

On January 22, 2018, the Court issued an order, Dkt. 63, which, as relevant here, directed Farrell, in light of his representations at the February 6, 2017 conference and in his briefs, to file a letter withdrawing his claims for municipal liability, excessive force, abuse of process, and failure to intervene. On January 26, 2018, Farrell filed a letter withdrawing these claims, leaving alive only his false arrest claims against Bolte and Morales. *See* Dkt. 64.

## II. Applicable Law

### A. Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

---

[3] Certain of the materials described in this paragraph were initially disseminated to opposing counsel (and the Court) by email, and were publicly filed only later after the Court approved the proposed redactions. *See* Dkt. 63. The dates used in this paragraph are the dates when the materials were disseminated to opposing counsel. The Court also observes once more that Farrell's submissions did not comply with this Court's scheduling order directing Farrell to file one omnibus brief in support of his motion for summary judgment and in opposition to defendants' motion. *See* Dkt. 30. Nevertheless, because Farrell has received the opportunity both to support his motion and to oppose defendants' motion, and because defendants have not claimed any prejudice, the Court has not invited further briefing.

judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). Rather, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)) (internal quotation marks omitted).

### B.      Legal Standards Governing Claims for False Arrest

Section 1983 provides redress for the deprivation of federally protected rights by persons acting under color of state law. 42 U.S.C. § 1983. To prevail on a § 1983 claim, a plaintiff must establish (1) the violation of a right, privilege, or immunity secured by the Constitution or laws of the United States (2) by a person acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155–56 (1978).

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996), *cert. denied*, 528 U.S. 946 (1999) (internal citations omitted); *accord Jenkins v.*

*City of New York*, 478 F.3d 76, 84 (2d Cir. 2007). Under New York law, a plaintiff bringing a claim for false arrest must show that "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (quoting *Broughton v. State of New York*, 37 N.Y.2d 451, 456 (1975)) (internal quotation marks omitted).

In light of the arguments made on the pending summary judgment motions, the Court elaborates here on two aspects of a false arrest claim: (1) the relevance of a showing of probable cause; and (2) the defense of qualified immunity.

### 1. Probable Cause

A confinement is privileged where the arresting officer had probable cause to arrest. *See Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003); *Jenkins*, 478 F.3d at 84 ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." (internal quotation marks and citation omitted)). Probable cause exists "when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Singer*, 63 F.3d at 119 (internal quotation marks omitted). "When determining whether probable cause exists courts must consider those facts *available to the officer* at the time of the arrest and immediately before it." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks and citation omitted); *accord Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.").

"[P]robable cause does not require an awareness of a particular crime, but only that some crime may have been committed." *Ackerson v. City of White Plains*, 702 F.3d 15, 20 (2d Cir. 2012) (internal quotation marks and citation omitted); *see also Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007) ("[A]n arrest is not unlawful so long as the officer ha[d] . . . probable cause to believe that the person arrested . . . committed any crime."). So long as an arrest is supported by probable cause, a person may be arrested for a violation of any offense committed in an officer's presence, no matter how minor, so long as that offense is a crime. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").

On summary judgment, the existence of probable cause may be determined as a matter of law "if there is no dispute as to the pertinent events and the knowledge of the officers." *Weyant*, 101 F.3d at 852. Where, however, the parties dispute material facts bearing on such events and knowledge, summary judgment is not appropriate. *Id.*[4]

---

[4] The parties dispute which side bears the ultimate burden of proof as to probable cause—*i.e.*, whether defendants must prove the existence of probable cause, *see* Pl. Opp. at 11 (citing *Raysor v. Port Auth. of N.Y. & N.J.*, 768 F.2d 34, 36 (2d Cir. 1985)), or plaintiffs must prove its absence, *see* Def. Mem. at 11 (citing *Lin v. City of New York*, No. 14 Civ. 9994 (PAE), 2016 WL 7439362, at *7 (S.D.N.Y. Dec. 21, 2016)). The Second Circuit has not resolved this question. *See Stinson v. City of New York*, 10 Civ. 4228 (RWS), 2014 WL 4742231, at *7 (S.D.N.Y. Sept. 23, 2014) (citing *Davis v. Rodriguez*, 364 F.3d 424, 434 n.8 (2d Cir. 2004)). This doctrinal dispute, however, does not have any bearing on the cross-motions pending here: Farrell's false arrest claim against Morales fails independent of whether there was probable cause to arrest Farrell, and disputes of material fact would preclude summary judgment to any party on Farrell's false arrest claim against Bolte, regardless of who bore the burden of proof as to probable cause.

Nevertheless, because this question may recur if this case reaches trial, the Court notes that it is easily resolved here given a particular fact: that the police lacked a warrant to arrest Farrell. Where law enforcement has not secured a warrant prior to the alleged arrest, the burden of establishing the existence of probable cause properly rests on the defendants, because probable cause is a defense to a § 1983 action for false arrest, not an element of a plaintiff's claim. *See*

## 2.    Qualified Immunity

Even absent probable cause to arrest the plaintiff, an officer will be entitled to qualified immunity if "arguable probable cause" existed—*i.e.*, if "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law." *Cerrone v. Brown*, 246 F.3d 194, 202–03 (2d Cir. 2001) (internal quotation marks and citation omitted). The doctrine of qualified immunity provides a complete defense where "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991). Its purpose is to "give[] government officials breathing room to make reasonable but mistaken judgments" and to protect "all but the plainly incompetent or those who knowingly violate the law." *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (internal quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

Because qualified immunity is an affirmative defense, defendants bear the burden of proving arguable probable cause. *See Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011).

## III.    Discussion

The video in this case is unsettling to watch. A hospital security guard, Farrell, is assigned to safeguard an operating room in which surgery on a seriously wounded officer is ongoing. A large number of police officers gather in the hallway immediately outside the

---

*Jenkins*, 478 F.3d at 84 (citing *Weyant*, 101 F.3d at 852); *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006). The same is true under New York law. *See Broughton*, 37 N.Y.2d at 458 ("[W]here the arrest or imprisonment is extrajudicial, that is, without legal process or color of legal authority, it is not necessary to allege want of probable cause in a false imprisonment action. Indeed, the burden is on the defendant to prove the opposite." (citations omitted)).

operating room, presumably to show support for their colleague. For reasons unexplained, after a disagreement breaks out, one or more officers displace the guard from his position, move him across the hallway, and sequester him in a nearby room, disabling him from guarding the operating room for a number of minutes. These events raise obvious questions about Bronx Lebanon Hospital's practices and procedures, at least on the day in question, in securing medical spaces, as well as the NYPD's practices and procedures in assuring that its officers—however legitimate their intentions in gathering to support an injured colleague—observe the boundaries the Hospital sets. The Court hopes that, in the interest of patient protection, this lawsuit will focus the Hospital's and the NYPD's attention on the need to put in place best practices to avoid, in the future, such chaotic tumult in and around operating rooms.

The issues in this lawsuit, however, are far narrower. As limited by plaintiff's voluntary dismissals of his other counts, they are whether on October 24, 2012, Officer Morales and/or Officer Bolte subjected Farrell to a false arrest. For the reasons that follow, the Court holds, on the cross-motions for summary judgment, that, viewing the facts in the light most favorable to Farrell, Morales cannot be held liable for false arrest. The Court therefore grants defendants' motion to the extent it seeks judgment in their favor on Farrell's claim against Morales. As for Bolte, however, the Court denies the cross-motions for summary judgment. There is substantial evidence, including videographic, that Bolte deliberately acted to confine Farrell against his will, and material facts are in dispute as to whether, *inter alia*, any arrest of Farrell was privileged.

### A. The Claim Against Morales

As noted, claims for false arrest under § 1983 are "substantially the same" as under New York law. *See Jocks*, 316 F.3d at 134–35. Accordingly, a plaintiff alleging false arrest must show, *inter alia*, that the defendant intentionally "obstruct[ed] or deprive[d] [him] of his freedom

to choose his own location." *Posr v. Doherty*, 944 F.2d 91, 97 (2d Cir. 1991) (quoting *Broughton*, 37 N.Y.2d at 456). To prove such intent, "a plaintiff must show that the defendant either: (a) confined or intended to confine plaintiff or (b) affirmatively procured or instigated the plaintiff['s] arrest." *King v. Crossland Sav. Bank*, 111 F.3d 251, 256 (2d Cir. 1997). Although the "underlying motivations for [an officer's] actions during the course of a seizure" are irrelevant, a plaintiff must prove that the officer "intended to commit acts" that constituted or set in motion a seizure in the first instance. *Dancy v. McGinley*, 843 F.3d 93, 116 (2d Cir. 2016). And although intent is generally an issue for the jury, *see Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Turtur*, 892 F.2d 199, 205 (2d Cir.1989), summary judgment is appropriate where no reasonable juror could find intent to confine, *see, e.g., Pelayo v. Port Auth.*, 893 F. Supp. 2d 632, 639–40 (S.D.N.Y. 2012).

Farrell and Morales did not interact after their initial confrontation, JSF ¶ 33, and that confrontation preceded Farrell's relocation to x-ray room. As a result, Farrell's two theories as to how Morales participated in his alleged confinement involve earlier acts by Morales. First, Farrell claims that by shouting at him something like "don't hit me" in a police-filled hallway, Morales intentionally set in motion a series of events foreseeably resulting in (*i.e.*, "proximately caus[ing]") Farrell's arrest. Pl. Opp. at 18. Second, Farrell claims that when Morales pushed Farrell, he physically restricted Farrell's movements so as to effect an arrest. *Id.* at 19.

Neither of these theories is viable. Whether considering them separately or together, a jury could not responsibly find that Morales confined, or intended to confine, Farrell.

As to the first theory, Farrell argues that, as a matter of "common-sense," "it is entirely foreseeable (if not certain) that an individual would be arrested if the person grabs a police officer and the officer says 'don't hit me'—particularly when NYPD officers were flooding the

surrounding area." Pl. Opp. at 18. It may be predictively likely that an arrest would follow under these circumstances. But Morales's exclamation did not itself constitute a seizure. Nor did his request not to be "hit" instruct that a seizure come about. Farrell's conjecture as to the likelihood of arrest, without more, following these words, does not support the inference that Morales "affirmatively procured or instigated [Farrell's] arrest," *King*, 111 F.3d at 256.

On the contrary, Morales's conduct, taken as a whole, was inconsistent with procuring or instigating an arrest. Morales did not formally arrest Farrell. Nor did he ask or order any of the other officers present to do so. Instead, the parties agree that following his exclamation, Morales tried again to make, or push, his way into the Code Room. *See* Pl. 56.1 ¶ 23 (Morales "entered the code room," where he pushed past another security guard); Morales Dep. at 71 (Morales "tried to go around [Farrell] a second time"). And, as both Farrell and Morales appear to agree, and as is consistent with the video, Morales apparently made no effort to see Farrell again. *See* JSF ¶ 33; Morales Dep. at 83. In view of this conduct directed entirely at entering the Code Room, no reasonable officer (and, in turn, no reasonable juror) would have understood Morales's exclamation as affirmative encouragement to initiate an arrest.

As to Farrell's second theory, to the effect that Morales physically restricted Farrell's movements, the facts also do not sustain a claim of false arrest. Because Farrell has alleged only "false arrest," Compl. ¶¶ 34–36, and does not claim an "unreasonable seizure" (or bring any other cause of action), Farrell must demonstrate that his contact with Morales "amounted to an arrest." *Posr*, 944 F. 2d at 98. And "not every seizure is an arrest." *Id.* Although an arrest may be effected by the application of physical force alone, *see California v. Hodari D*, 499 U.S. 621, 625 (1991), a false arrest claim requires at least that "the subject is restrained and his freedom of movement is restricted," *Posr*, 944 F.2d at 98; *see also Reinhart v. Jakubowski*, 657 N.Y.S.2d

802, 803 (2d Dep't 1997) (false arrest claim requires a "police intrusion of such magnitude that [plaintiff's] liberty of movement was significantly interrupted"). In determining whether a police encounter ripened into an arrest, the Second Circuit considers the "seizure's level of intrusiveness." *Posr*, 944 F.2d at 98. More specifically, the Circuit looks to the "amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used." *United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004) (quoting *United States v. Perea*, 986 F.2d 633, 645 (2d Cir. 1993)).

In distinguishing between investigatory detentions and arrests, federal courts consistently have identified arrests as involving, at a minimum, some control over the suspect's movements. *See, e.g.*, *Sibron v. New York*, 392 U.S. 40, 67 (1968) (arrest where officer seized suspect and curtailed his movement by grabbing his collar); *Posr*, 944 F.2d at 99 (arrest where officer took "physical control" of plaintiff, "slammed" him against a wall, and stated "you are dead"); *cf. United States v. Fiseku*, No. 15 Cr. 384 (PAE), 2015 WL 7871038, at *8–10 (S.D.N.Y. Dec. 3, 2015) (no arrest even where suspects were patted down and briefly handcuffed). And although "mere grasping or application of physical force" may constitute an arrest, *Hodari D*, 499 U.S. at 624, such contact does not *necessarily* rise to that level. *See United States v. Zapata*, 18 F.3d 971, 977 (1st Cir. 1994) ("Although an officer did touch appellant, that datum merely establishes that a seizure occurred; it does not dispose of the question of what sort of seizure took place. What is decisive in this case is that nothing the officers did, alone or in combination, including the modest laying-on of hands, sufficed to convert the investigatory stop already in progress into

15

an arrest." (footnote omitted)); *cf. Graham v. Connor*, 490 U.S. 386, 396 (1989) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." (internal citation and quotation marks omitted)).

Under the circumstances here, Morales's intrusion on Farrell's liberty of movement was, at best, minimal and fleeting. Viewing the facts in the light most favorable to Farrell, Morales's physical contact with Farrell consisted entirely of placing the back of his hand on Farrell's waist and attempting, unsuccessfully, to push Farrell aside so as to clear a path into the Code Room. *See* Farrell Dep. at 57. This momentary contact does not rise to the level of an arrest, or come close. Indeed, by Farrell's own account, Morales's attempt to clear space for himself neither moved Farrell nor restricted Farrell's ability to move. *See id.* (Farrell testifying Morales was unable to push him aside); *Carrington v. City of New York*, 607 N.Y.S.2d 721, 722 (2d Dep't 1994) (no claim for false arrest where defendants neither "restricted [plaintiff's] ability to move, [n]or confined him in any way").

Because Morales neither arrested Farrell nor affirmatively procured his arrest, Morales cannot be held liable for false arrest. Farrell's claim against him must be dismissed.

## B.    The Claim Against Bolte

As against Bolte, however, Farrell has a strong if not compelling argument that he was subjected to an arrest. Indeed, viewing the facts in the light most favorable to Farrell's claim, Bolte arguably arrested Farrell twice: first, when Bolte grabbed him and escorted him across the hospital hallway, *see* JSF ¶ 21; Video 6:51:42–52, and second, when Bolte shoved him in a room and directed at least one officer to guard the door so as to prevent Farrell from leaving, *see* JSF ¶ 21; Def. Counter 56.1 ¶ 33. To be sure, defendants dispute the claim of arrest, including whether, under the circumstances, Farrell was free to leave the x-ray room, *see* Def. Mem. at 8–

10, and whether Bolte instructed Farrell not to leave, *compare* Farrell Dep. at 59 (Farrell testifying that Bolte said "[g]et in there" and "ordered" Farrell to stay inside), *with* Bolte Dep. at 106 (Bolte testifying "I didn't say anything to him"). Regardless, the record supplies Farrell with an ample factual basis on which to argue at trial that he was arrested. *See, e.g., Sibron*, 392 U.S. at 67 (arrest where officer grabbed suspect by the collar); *Dunaway v. New York*, 442 U.S. 200, 212 (1979) (arrest where suspect was taken to interrogation room, never told he was free to leave, and would have been physically restrained had he attempted to leave).

Even assuming *arguendo* that an arrest were found,[5] however, material facts are in dispute as to whether such an arrest was or was not privileged, preventing summary judgment from being granted to either side. These facts prevent the Court from resolving whether Bolte's actions in confining Farrell were justified by probable cause or exigency. In particular, there are unresolved questions as to (1) when Bolte took notice of the interaction between Farrell and Morales, and (2) what Bolte saw. These disputes require that Farrell's false arrest claim against Bolte be resolved at trial. *See Jenkins*, 478 F.3d at 88 ("[I]f the officer's reasonableness depends on material issues of fact, then summary judgment is inappropriate for both New York and federal false arrest claims.").

Bolte's argument as to this element is that, under the circumstances as he encountered them, he had probable cause (or, for purposes of qualified immunity, arguable probable cause) to believe that Farrell had committed any of "several offenses," including assault on a police officer

---

[5] The Court here has no occasion to resolve that issue. However, given the apparent strength of Farrell's claim on the element of Bolte's confinement of him, the Court anticipates, at the close of evidence, inviting argument from counsel as to whether the jury must be instructed as a matter of law that Farrell was arrested by Bolte (and if so, at what point).

and harassment. Under the version of the facts that Bolte urges, Bolte snapped to attention only when Morales yelled, "don't put your hands on me":

> As Lt. Bolte looked up from his phone call and focused on both individuals, he observed Plaintiff's hands on Lt. Morales' body. It is also undisputed that Lt. Bolte only moved Plaintiff into the x-ray room after he himself was backed into a wall by Plaintiff in the course of the ongoing physical altercation between Plaintiff and Lt. Morales. Under the circumstances, Lt. Bolte had reason to believe that Plaintiff had used physical force against a uniformed member of NYPD.

Def. Mem. at 12–13 (citation omitted); *see also id.* at 22–23 ("Lt. Bolte observed Plaintiff with his hands on Lt. Morales and heard Lt. Morales yell at Plaintiff not to touch him. On this basis, it was reasonable for Lt. Bolte to believe that Plaintiff was assaulting or attempting to assault Lt. Morales, creating arguable probable cause for his arrest."). In the same vein, Bolte claims that Farrell's seizure was justified by exigent circumstances. *See id.* at 14–15 ("Bolte acted within a matter of seconds to remove the person he believed had instigated the physical altercation in order to ensure that medical treatment for the injured officer was not disrupted.").

These defenses, however, depend on disputed facts. First, although Bolte most recently testified that he "[took] notice" of the altercation only when Morales shouted and fell backwards with Farrell's hands on him, Bolte Dep. at 93–94, Bolte previously testified that he had witnessed the confrontation from the beginning, *see* Bolte CCRB at 7 (Bolte testifying he saw Farrell "grab" Morales as Morales attempted "to pull the curtain"); Bolte Bx. Invest. at 8 (Bolte testifying he saw "out of the corner of [his] eye what's happening and Lt. Morales trying to get around this guy"). Farrell therefore urges that Bolte's more recent claim to have witnessed only Morales's exclamation and its aftermath be rejected as lacking credibility. *See* Pl. Counter 56.1 ¶ 5 (admitting Bolte was on his phone, but noting Bolte's prior testimony indicated he witnessed

Farrell and Morales's entire interaction); *id.* ¶ 6 (disputing that Bolte took action based on hearing Morales's exclamation).

Likewise, the parties dispute the events that actually happened in front of Bolte. At the outset, the parties squarely dispute who initiated the tussle between Morales and Farrell. *See* JSF ¶ 19 ("The parties do not stipulate as to who made initial physical contact."). And as for what Bolte saw, Bolte testified that he observed Farrell's hands on Morales's chest and shoulder. *See* Bolte Dep. at 93. But Farrell denies that he ever placed his hands on Morales, and "has consistently maintained that he did not make physical contact with Morales in any way." Pl. Counter 56.1 ¶ 7. If credited, Farrell's denial would substantially impeach Bolte's claim to have seen Farrell so act.[6]

These disputes collectively preclude summary judgment in either party's favor. Construing the facts in the light most favorable to Bolte, as is required in resolving Farrell's motion, Bolte acted with at least arguable probable cause in restraining Farrell. That is so because Bolte, previously unaware of any physical confrontation between Morales and Farrell, and without any knowledge that Morales had acted unlawfully, alerted to the sound of Morales shouting "don't put your hands on me," and immediately saw Farrell with his hands on Morales's chest and shoulder. On that factual premise, Bolte, at that point, had sufficient information to warrant a reasonable belief that Farrell was in the process of "subject[ing] [Morales] to physical contact" with the intent to "harass, annoy or alarm," and therefore guilty of harassment in the second degree. N.Y. Penal Law § 240.26; *see McIntosh v. City of New York*, No. 17-617, 2018 WL 542583, at *1 (2d Cir. Jan. 25, 2018) (summary order) (probable cause

---

[6] Although the Video is consistent with Morales initiating the confrontation and Farrell thereafter placing his hands on Morales, the crowded hallway and low-resolution footage prevent the Court from reaching any definitive conclusion as to what transpired. *See* Video at 6:51:31–39.

that plaintiff had committed harassment in the second degree sufficient to defeat false arrest claim).

On the other hand, assuming that the facts were found in Farrell's favor, as the Court must assume in resolving Bolte's motion, no reasonable officer in Bolte's position could have believed he was authorized to arrest Farrell. That is so because, under the facts Farrell urges be accepted, Bolte witnessed Morales, unprompted and without any evident justification, attempt to push Farrell aside, after which Farrell kept his hands off of Morales. Under these circumstances, there is no viable claim that Farrell committed a crime. And even if the Court assumes, as the Video suggests, that Farrell did make contact with Morales after Morales pushed him, any such contact would have been proportional to the contact Morales unjustifiably initiated. *See Jocks*, 316 F.3d at 136 (officer not entitled to judgment as a matter of law where, accepting plaintiff's facts, officer "knew that [plaintiff's] actions were not criminal because [plaintiff] was acting in self-defense"); *see also* N.Y. Penal Law § 35.15(1) (authorizing use of physical force against another "to the extent he or she reasonably believes such to be necessary to defend himself, herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person").

Nor is Bolte entitled to summary judgment by virtue of an exigency defense. It is true that a seizure without consent or a warrant is reasonable if justified by exigent circumstances. *See Tenenbaum v. Williams*, 193 F.3d 581, 604 (2d Cir. 1999). But exigency arises from the "need to protect or preserve life or avoid serious injury." *Mincey v. Arizona*, 437 U.S. 385, 392 (1978). Here, on the facts Farrell urges be found, there was no danger of serious injury to Morales, whom Farrell never touched. Pl. Counter 56.1 ¶ 7. And even if their altercation might have threatened the safety of the officer receiving emergency medical treatment, *see* Bolte Dep.

at 108, viewing the facts in the light most favorable to Farrell, it was Morales who created any exigency by attempting to push Farrell aside without justification, *see Kentucky v. King*, 563 U.S. 452, 462 (2011) (exigency defense unavailable where police "create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment").

In view of the foregoing, it is clear that the issue of Bolte's probable cause is "predominantly factual in nature." *Moore v. Comesanas*, 32 F.3d 670, 673 (2d Cir. 1994). And given the "rule that resolution of genuine factual issues is inappropriate on motions for summary judgment based on qualified immunity," *McClellan v. Smith*, 439 F.3d 137, 149 (2d Cir. 2006), Bolte's motion for summary judgment on the basis of qualified immunity must be denied as well. If this case proceeds to trial, however, the Court anticipates soliciting input from the parties as to what questions should be put to the jury, in a special verdict form, that would tend to establish or preclude the availability of a qualified immunity defense.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss as to Morales, and otherwise denies the parties' cross-motions for summary judgment. The Clerk of Court is respectfully directed to close the motions pending at Dkts. 42 and 65 and to terminate all defendants save Bolte. An order will issue shortly as to next steps in this matter.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: February 15, 2018
      New York, New York